Filed 11/18/25  P. v. Grandison CA4/1
Opinion following transfer from Supreme Court

OPINION AFTER TRANSFER FROM THE CALIFORNIA SUPREME COURT

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D082992 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. RIF2000873) |
| RODERICK LAMAR GRANDISON et al., | |
| Defendants and Appellants. | |

APPEAL from a judgment of the Superior Court of Riverside County, Stephen J. Gallon, Judge.  Affirmed in part, reversed in part, and remanded with directions.

Stephen M. Lathrop, under appointment by the Court of Appeal, for Defendant and Appellant, Roderick Lamar Grandison.

Johanna Pirko, under appointment by the Court of Appeal, for Defendant and Appellant, John Lamont Bush.

Rob Bonta, Attorney General, Lance E. Winters and Charles C. Ragland, Chief Assistant Attorneys General, Melissa Mandel, Supervising

Deputy Attorney General, Ann M. Spitzberg and Stephanie H. Chow, Deputy Attorneys General for Plaintiff and Respondent.

The People charged John Lamont Bush (the shooter) and Roderick Lamar Grandison (his codefendant) with first degree murder (Pen. Code,[1] § 187, subd. (a); count 1), robbery (§ 211; counts 2, 4, 6), assault with a firearm (§ 245, subd. (a)(2); counts 3, 5, 7), and being a felon in possession of a firearm (§ 29800, subd. (a)(1); count 8 [Bush] and count 9 [Grandison]).  The information alleged as to count 1 a special circumstance that Bush committed the murder during the commission of a robbery.  (§ 190.2, subd. (a)(17)(A).)  It alleged as to count 1 that Bush personally and intentionally discharged a firearm causing death.  (§§ 12022.53, subd. (d), 1192.7, subd. (c)(8).)  It alleged as to Bush in counts 2 and 4, and as to Grandison in count 6, that they personally and intentionally discharged a firearm causing great bodily injury or death (§§ 12022.53, subd. (b), 1192.7, subd. (c)(8)) during the commission of those robberies.[2]  It alleged as to both defendants that they suffered prior serious felony convictions within the meaning of the "Three Strikes" law.

*Bush's Verdict and Appellate Contentions*

Following a joint trial before separate juries, Bush was convicted of counts 1 through 8, and his jury found true all of the allegations against him. The court sentenced Bush to life in prison without the possibility of parole for the special circumstance murder plus 25 years to life for the gun

---

[1]     Undesignated statutory references are to the Penal Code.

[2]     The information also alleged Grandison was a principal armed in the commission of counts 1, 2, 4, and 6 (§ 12022, subd. (a)(1)).  However, before jury deliberations began, the court granted the People's motion and dismissed those firearm enhancements against Grandison.

2

enhancement, plus a determinate term of 18 years eight months in prison. It stayed the sentence for counts 2, 3, and 7 under section 654. It struck the count 2 and 6 enhancements.

Bush contends there was no evidence he aided and abetted Grandison in the count 6 robbery and count 7 assault. He further contends the abstract of judgment should be amended to reflect that his count 2, 4, and 6 convictions were for second degree robbery, not first degree robbery as stated in the abstract of judgment.

*Grandison's Verdict and Appellate Contentions*

A jury convicted Grandison of all charges except the count 5 assault with a firearm. It found true allegations that Grandison personally used a firearm in the commission of count 6. (§ 12022.53, subd. (b).) In bifurcated proceedings, he admitted that he suffered prior convictions for voluntary manslaughter (§192, subd. (a)) and robbery (§ 211). The court sentenced Grandison to a total term of 170 years to life in state prison. It stayed his sentences for counts 2, 3, and 7 (each 25 years to life) under section 654.

Grandison contends there was insufficient evidence that he was a major participant and acted with reckless indifference to human life in the count 1 felony murder and therefore that conviction should be reversed. He further contends the abstract of judgment should be amended to show (1) he was convicted of second degree robbery; (2) the 25-year-to-life sentences on counts 2 , 3 and 7 should be stayed under section 654; and (3) he was convicted of being a felon in possession of a firearm, but the abstract of judgment states "convicted felon and narcoti[c]."

We initially issued an opinion affirming both defendants' judgments of conviction. Grandison appealed to the California Supreme Court, but Bush did not. The California Supreme Court transferred the matter to us with

3

directions to vacate our opinion and reconsider the cause in light of *People v. Emanuel* (2025) 17 Cal.5th 867 (*Emanuel*). Having done so, we affirm the judgment of conviction as to Bush. We reverse Grandison's count 1 felony murder conviction, and otherwise affirm his judgment. The People concede both abstracts of judgment must be amended; we agree and remand with directions.

FACTUAL AND PROCEDURAL BACKGROUND

*Counts 4 and 5* (*Robbery and Assault in Perris*)

On February 28, 2020, commencing at approximately 1:30 a.m., Grandison and Bush robbed three convenience stores. In Perris, California, Bush walked into the store and made a purchase. As the store clerk opened the cash register, Bush pointed a handgun at his head and ordered him to sit on the floor. The clerk complied. Bush stole money from the cash register and ran to the waiting vehicle, which immediately drove away. Bush shared the money with his two coparticipants. The clerk later identified Bush from a photographic lineup. The jury saw surveillance videos showing Bush's movements into and out of the store.

*Counts 6 and 7* (*Robbery and Assault in Moreno Valley*)

At approximately 2:30 a.m., Grandison entered a Moreno Valley convenience store and asked to buy a cigar. A store clerk testified that when he opened the cash register, Grandison pointed a gun at him and threatened to shoot him. Grandison demanded the clerk hand over all the money from both cash registers. The clerk pleaded for his life, and handed over the money to Grandison. As Grandison was leaving the store, he tried to fire the gun, which ejected a bullet that was later found in the store. Grandison ran and jumped into a waiting vehicle. He handed the gun back to Bush. Grandison also divided the money he obtained with his coparticipants.

4

The jury saw surveillance videos that captured the arrival and departure of the car that transported Grandison. The vehicle was registered to Marleiya Barnes  Other surveillance videos captured Grandison's threats and actions inside the store.

*Counts 1, 2 and 3* (*Murder, Robbery and Assault in Riverside*)

Shortly before 3:20 a.m., Bush entered a convenience store in Riverside, jumped over the counter, and struggled with the store clerk, W.T.  Bush shot him four times at close range, causing his death.  Bush took money from the cash register and fled to the waiting vehicle.  Thereafter, he shared his proceeds with his two coparticipants.  The jury saw surveillance videos of Bush's actions inside the convenience store.

*Counts 8 and 9*  (*Felon in Possession of a Firearm*)

Grandison and Bush did not testify at trial.  They stipulated they had previously been convicted of felonies; consequently, they were legally barred from carrying firearms.

*Investigation*

A Riverside police department detective testified that forensic evidence showed the same weapon appeared to be used in all three robberies.

Police detained Grandison and video recorded their interview with him, which was played for his jury.  Grandison said he was 47 years old.  He had known Marleiya Barnes for the past six or seven months, and was trying to court her.  He had met Bush before.  While it was still daylight on the evening before the crimes, Barnes drove him and Bush from Los Angeles to Riverside.  She was also the driver during the crimes.  Grandison said he fell asleep at one point and when he woke up, Barnes and Bush were laughing about Bush having just robbed the first store.  Grandison shared in the proceeds from that robbery.  They then drove to the next store, where Bush

5

handed Grandison the gun and Grandison went inside and robbed that store. Grandison acknowledged that during the robbery he racked the gun, which ejected a round. The clerk looked scared and handed over the money. Grandison said he handed the gun back to Bush and fell asleep again. When he next woke up, Bush had just returned to the car and they were driving away. Grandison heard Bush recount his having robbed another store and obtaining some money.

A detective asked why Grandison entered the store in the second robbery, since he was not wearing a mask. Grandison replied, ". . . [L]ike I said, fun and kicks and games. It was all laughs to me."[3]

A homicide detective testified phone logs showed that before the robbery, Barnes and Grandison exchanged several phone calls. Bush was listed as a contact in Barnes's phone.

---

[3] Grandison filed a motion to augment the record on appeal to include a transcript of a separate interview he held with a different detective. The trial court declined to admit this second transcript into evidence. We deemed the motion to be one to take additional evidence, which we deferred for consideration with this appeal. We now deny the motion. Grandison does not attempt to show the trial court's ruling was erroneous. He also does not explain what specific argument he seeks to raise that will require the second transcript. He merely asserts: "Appellate counsel has reviewed portions of the first and second interviews and has identified a potential appellate issue in the court's denial of the defense request to admit the second interview. A transcript of the second interview must be included in the record on appeal in order for counsel to raise an issue relating thereto on appeal. Accordingly, appellate counsel requests that the document submitted herewith as Exhibit 'A' be included in the record on appeal." We conclude the motion to take additional evidence on appeal lacks any legal or factual support.

## DISCUSSION

### I. *Sufficiency of the Evidence Claims*

### A. *Standard of Review and Aiding and Abetting Principles*

" 'When reviewing a challenge to the sufficiency of the evidence, we ask " 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " [Citation.] Because the sufficiency of the evidence is ultimately a legal question, we must examine the record independently for " 'substantial evidence—that is, evidence which is reasonable, credible, and of solid value' " that would support a finding beyond a reasonable doubt.' " (*People v. Navarro* (2021) 12 Cal.5th 285, 302.) "If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding." (*People v. Albillar* (2010) 51 Cal.4th 47, 60.)

"A sufficiency of evidence challenge to a special circumstance finding is reviewed under the same test applied to a conviction." (*People v. Stevens* (2007) 41 Cal.4th 182, 201.) "To determine whether the evidence supports a special circumstance finding, we must review ' "the entire record in the light most favorable to the judgment to determine whether it discloses evidence that is reasonable, credible, and of solid value such that a reasonable jury could find" ' the special circumstance allegation true ' "beyond a reasonable doubt." ' " (*People v. Becerrada* (2017) 2 Cal.5th 1009, 1028.) We " 'presume[] in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' " (*People v. Catlin* (2001) 26 Cal.4th 81, 139.)

"[A] person who aids and abets a crime is guilty of that crime even if someone else committed some or all of the criminal acts." (*People v. McCoy* (2001) 25 Cal.4th 1111, 1117.) " ' A person aids and abets the commission of a crime when he or she, (i) with knowledge of the unlawful purpose of the perpetrator, (ii) and with the intent or purpose of committing, facilitating or encouraging commission of the crime, (iii) by act or advice, aids, promotes, encourages or instigates the commission of the crime.' " (*People v. Hill* (1998) 17 Cal.4th 800, 851.) Mere presence at the scene of a crime or knowledge of, but failure to prevent the crime, are not sufficient to establish aiding and abetting its commission. (*People v. Campbell* (1994) 25 Cal.App.4th 402, 409.) However, factors which may be considered to determine aiding and abetting include presence at the scene of the crime, companionship, and conduct before and after the offense. (*Ibid.*)[4]

---

[4] The court instructed the jury regarding aiding and abetting with CALCRIM No. 400 as follows: "A person may be guilty of a crime in two ways. One, he or she may have directly committed the crime. I will call that person the perpetrator. Two, he or she may have aided and abetted a perpetrator, who directly committed the crime. [¶] A person is guilty of a crime whether he or she committed it personally or aided and abetted the perpetrator. [¶] Under some specific circumstances, if the evidence establishes aiding and abetting of one crime, a person may also be found guilty of other crimes that occurred during the commission of the first crime."

The court also instructed the jury with CALCRIM No. 401 as follows: "To prove that a defendant is guilty of a crime based on aiding and abetting that crime, the People must prove that: [¶] 1. The perpetrator committed the crime; [¶] 2. The defendant knew that the perpetrator intended to commit the crime; [¶] 3. Before or during the commission of the crime, the defendant intended to aid and abet the perpetrator in committing the crime; [¶] AND [¶] 4. The defendant's words or conduct did in fact aid and abet the perpetrator's commission of the crime. [¶] Someone aids and abets a crime if he or she knows of the perpetrator's unlawful purpose and he or she specifically intends to, and does in fact, aid, facilitate, promote, encourage, or

B. *Bush's Contention*

Bush concedes that "the circumstances surrounding Grandison's commission of the [ ] robbery suggest [Bush] was complicit in the robbery." He nevertheless claims "there is no evidence of any affirmative action taken to assist in the robbery. For this reason, the count 6 and 7 convictions, which are premised solely on an aiding and abetting theory, should be reversed."

1. *Background*

During closing arguments, the parties argued for and against their respective positions regarding whether Bush aided and abetted Grandison in committing counts 6 and 7. The prosecutor argued: "First of all, . . . Grandison comes in with that same black sweatshirt, with the hood up, with the gun in the same exact pocket. Okay? Don't forget that, because that's important in how we know about this aiding and abetting. [¶] He demands money out of both registers and then he leaves, heads . . . back across that parking lot as you know. There is absolutely a robbery. . . . Grandison also points the gun at the victim in this case. Okay? [¶] So how, if . . . Grandison is the one who went in, how is it that . . . Bush is responsible for that? That's based on aiding and abetting. . . . [¶] So we know that these guys are working together. And what we know about aiding and abetting is the guy that's outside being the lookout, the guy that's the getaway driver, they are equally as culpable for that burglary. And that's the same thing here. . . .

---

instigate the perpetrator's commission of that crime. [¶] If all of these requirements are proved, the defendant does not need to actually have been present when the crime was committed to be guilty as an aider and abettor. [¶] If you conclude that defendant was present at the scene of the crime or failed to prevent the crime, you may consider that fact in determining whether the defendant was an aider and abettor. [¶] However, the fact that a person is present at the scene of a crime or fails to prevent the crime does not, by itself, make him or her an aider and abettor."

9

You do not have to be present inside when the crime is committed. . . . [¶] Planning in the crime is helping. Giving somebody the gun is helping. Letting them use your sweatshirt to go in and while you sit in the getaway car, that's helping. Being the getaway driver, that's helping. This was all done together. They were working as a group here. And if you notice the sequence, Bush goes in, Grandison goes in, Bush goes in, and then all hell broke loose, obviously. So that's when things stopped, clearly."

Bush's counsel conceded there was some evidence pointing to a plan between Bush and Grandison: "[The homicide detective] testified there were numerous calls between . . . Bush and . . . Grandison. This is an indication, circumstantial evidence, that they were the ones that planned this. It's a circumstantial inference base that you have actually received." But counsel disputed the prosecutor's interpretation of the evidence: "We know that . . . Grandison committed the robbery because we saw him on videotape. And we can clearly see that . . . Grandison doesn't look anything like . . . Bush. . . . Grandison is a big guy. . . . Bush is a smaller guy. So that's important because the district attorney talked about the same sweatshirt. You can clearly see, sure, they may have the same kind of sweatshirt on, but she is claiming it is the same sweatshirt, and there is no proof of that. That's the more important part of that scenario, is because there is no proof that the same shirt that . . . Grandison had on is the same one that . . . Bush had. There was no testimony. There was no DNA. There was no soot. There was no—no—no nothing. There was no evidence."

2. *Analysis of Bush's Contention*

We preliminarily reiterate what was stated in the court's instruction to the jury with CALCRIM Nos. 223 and 225: Crimes may be proved by direct and circumstantial evidence or by a combination of both. Neither is entitled

10

to any greater weight than the other. Both are acceptable types of evidence to prove or disprove intent or mental state. Therefore, Bush's suggestion that circumstantial evidence regarding his role in committing counts 6 and 7 was of lesser value is unavailing. The same is true of his claim that his convictions were based "solely" on an aiding and abetting theory. On appeal, "[w]e 'must accept logical inferences that the jury might have drawn from the circumstantial evidence.' " (*People v. Zamudio* (2008) 43 Cal.4th 327, 357-358.)

We conclude there was sufficient evidence supporting the jury's verdict that Bush aided and abetted Grandison's commission of counts 6 and 7. Bush accompanied Grandison and Barnes from Los Angeles to Riverside earlier in the day, and they spent several hours together before they began their crime spree. They therefore had sufficient time to plan their crimes. They also had knowledge of the unlawful purpose of each other's crimes, as they took turns carrying out the robberies in a coordinated manner. After Bush committed the first one, the three shared the proceeds. The evidence showed Grandison used the same gun to commit the second robbery. After Grandison committed the second one, he shared the proceeds also. Therefore, the jury reasonably could have inferred that Bush and Grandison were completely invested in ensuring the success of the robberies for their mutual benefit, and that Bush intentionally aided Grandison's robbery of the second store.

C. *Grandison's Contention*

Grandison contends there was insufficient evidence that, as to the count 1 felony murder charge, he was a major participant and acted with reckless indifference to human life under the applicable law; therefore, his conviction on that count should be reversed.

11

1. *Background*

The court instructed the jury on first degree felony murder with CALCRIM No. 540B as follows: The CALCRIM No. 540B instruction stated as follows: "The defendant is charged in count 1 with murder, under a theory of first degree felony murder. The defendant may be guilty of murder, under a theory of felony murder, even if another person did the act that resulted in the death. I will call the other person the perpetrator. [¶] To prove that the defendant is guilty of first degree murder under this theory, the People must prove that: [¶] Number one, the defendant committed, or aided and abetted robbery; [¶] Two, the defendant intended to commit, or intended to aid and abet the perpetrator in committing robbery; [¶] Three, if the defendant did not personally commit robbery, then a perpetrator, whom the defendant was aiding and abetting, committed robbery; [¶] Four, while committing robbery, the perpetrator caused the death of another person; [¶] Five, the defendant was a major participant in the robbery; and [¶] Six, when the defendant participated in the robbery, he acted with reckless indifference to human life. [¶] To decide whether the defendant and the perpetrator committed robbery, please refer to the separate instructions that I will give you on that crime. [¶] To decide whether the defendant aided and abetted a crime, please refer to the separate instructions that I will give you . . . on aiding and abetting. You must apply those instructions when you decide whether the People have proved first degree murder under a theory of felony murder. [¶] The defendant must have intended to commit, or aided and abetted the felony of robbery before or at the time of the death. It is not required that the defendant be present when the act causing the death occurs. [¶] A person acts with reckless indifference to human life when he knowingly engages in criminal activity that he knows involves a grave risk of death. [¶] When you

12

decide whether the defendant acted with reckless indifference to human life, consider all the evidence. No one of the following factors is necessary, nor is any one of them necessarily enough, to determine whether the defendant acted with reckless indifference to human life. [¶] Among the factors you may consider: [¶] Did the defendant know that a lethal weapon would be present during the robbery? [¶] Did the defendant know that a lethal weapon was likely to be used? [¶] Did the defendant know a lethal weapon was used? [¶] Did the defendant know the number of weapons involved? [¶] Was the defendant near the person killed when the killing occurred? [¶] Did the defendant have an opportunity to stop the killing or help the victim? [¶] How long did the crime last? [¶] Was the defendant aware of anything that would make a coparticipant likely to kill? [¶] Did the defendant try to minimize the possibility of violence? [¶] When you decide whether the defendant was a major participant, consider all the evidence. No one of the following factors is necessary, nor is any one of them necessarily enough, to determine whether the defendant was a major participant. Among the factors you may consider are: [¶] What was the defendant's role in planning the crime that led to the death? [¶] What was the defendant's role in supplying or using lethal weapons? [¶] What did the defendant know about dangers posed by the crime, any weapons used, or past experience or conduct of the other participants? [¶] Was the defendant in a position to facilitate or to prevent the death? [¶] Did the defendant's action or inaction play a role in the death? [¶] What did the defendant do after lethal force was used?"

Both the prosecutor and defense counsel argued to the jury their respective views of how the evidence satisfied, or failed to satisfy, the felony murder rule requirements. The prosecutor argued Grandison was as responsible for the murder as Bush: "Let's talk about what felony murder

requires.  It requires that the defendant aid and abet in the robbery.  . . .  He doesn't have to aid and abet in the murder.  He is aiding and abetting in the robbery.  . . .  Bush commits the robbery.  During the robbery, Bush caused the death of the victim.  And . . . Grandison was a major participant in the robbery.  . . .  And he acted with reckless indifference.  . . .  [¶]  I don't even have to show that . . . Bush and . . . Grandison intended on someone dying before they started this robbery spree.  I don't have to even show that . . . Bush went in there with the intent to kill someone."  The prosecutor added, "It's not a coincidence that they are hitting [convenience stores] near the freeway.  These are specific stores hit in that manner so they could jump on the freeway and get out of there.  [¶]  And then I want you to think about the getaway vehicles based on what we know.  Perris, we know that there is clearly some planning.  Car pulls up in the back, he gets out, waits for him there, and he comes right out to that car.  [¶]  Moreno Valley.  . . . [Grandison] gets dropped—the car, he gets dropped off from across the street.  Remember, he comes from across the street.  Why?  They don't want the car to be in the front of the store.  They don't want the cameras that are potentially in front of the store to catch them.  . . .  They're waiting for the opportune time to act."

Grandison's counsel conceded in closing argument that Grandison committed the second robbery in Moreno Valley, but he disputed Grandison's culpability for murder during the third robbery:  "[Grandison] didn't go in. . . .  There is no contradictory evidence, is there?  There is no evidence that says that he is awake.  So keep that in mind, that the burden never shifts." Counsel further conceded some of the factors enumerated in CALCRIM No. 540B were not favorable to Grandison:  "Now, the People have alluded to the fact that the—on that third robbery Bush obtained the gun from Grandison.

14

Well, that's true. That's what Grandison told the officers. But look at the context. . . . [¶] So the point I am trying to make is . . . Grandison is not doing anything specifically to aid and abet in this third robbery. Yes, yes, yes, I'll say it three times, yes, he shared in the money afterward. But does that make him an aider and abettor? I would suggest not." Counsel also conceded Grandison knew Bush would use a lethal weapon in the third robbery.

2. *Applicable Law*

Section 189, subdivision (e), provides that a participant in a specified felony is liable for murder for a death during the commission of the offense only if one of the following is proven: "(1) The person was the actual killer. [¶] (2) The person . . . , with the intent to kill, aided, abetted . . . , or assisted the actual killer . . . . [¶] (3) The person was a major participant in the underlying felony and acted with reckless indifference to human life[.]"

The California Supreme Court has ruled: "[T]he actus reus for the felony-murder aider and abettor special circumstance requires more than simply being an aider and abettor of the underlying felony under section 31. The special circumstance requires that the defendant be a ' "major participant" ' in the underlying felony. [Citation.] Likewise, the mens rea requirement for the felony-murder aider and abettor special circumstance is different from that required for first degree felony murder. The special circumstance requires that the defendant have ' "reckless indifference to human life." ' " (*People v. Clark* (2016) 63 Cal.4th 522, 615 (*Clark*).)

In *People v. Banks* (2015) 61 Cal.4th 788, 794 (*Banks*) and its follow-up decision, *Clark, supra,* 63 Cal.4th at pp. 618-622, the California Supreme Court identified several factors courts should consider in determining whether, under the totality of the circumstances, a defendant was a major

15

participant in the underlying felony who acted with reckless indifference to human life: "What role did the defendant have in planning the criminal enterprise that led to one or more deaths?  What role did the defendant have in supplying or using lethal weapons?  What awareness did the defendant have of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants?  Was the defendant present at the scene of the killing, in a position to facilitate or prevent the actual murder, and did his or her own actions or inaction play a particular role in the death?  What did the defendant do after lethal force was used?" (*Banks, supra,* 61 Cal.4th at p. 803.)

The *Banks* court explained that a defendant's knowing participation in a robbery with others who are armed is insufficient, without more, to prove the defendant acted with reckless indifference to human life.  (*People v. Strong* (2022) 13 Cal.5th 698, 706; *Banks, supra,* 61 Cal.4th at pp. 808-810.) "Awareness of no more than the foreseeable risk of death inherent in any armed crime is insufficient," because a defendant must "knowingly creat[e] a 'grave risk of death' " through the defendant's "own actions."  (*Banks,* at pp. 808, 807.)  *Clark* expanded on the "reckless indifference to human life" element, stating that it "encompasses a willingness to kill (or to assist another in killing) to achieve a distinct aim, even if the defendant does not specifically desire that death as the outcome of [the defendant's] actions." (*Clark,* at pp. 616, 617.)  " 'These requirements significantly overlap . . . for the greater the defendant's participation in the felony murder, the more likely that he acted with reckless indifference to human life.' "  (*Id.* at p. 615.)

The California Supreme Court has explained that "reckless indifference to human life" has a subjective and an objective element.  (*In re Scoggins* (2020) 9 Cal.5th 667, 677.)  "As to the subjective element, '[t]he defendant

16

must be aware of and willingly involved in the violent manner in which the particular offense is committed,' and [the defendant] must consciously disregard 'the significant risk of death [the defendant's] actions create.' [Citations.] As to the objective element, ' "[t]he risk [of death] must be of such a nature and degree that, considering the nature and purpose of the [defendant's] conduct and the circumstances known to [the defendant], its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the [defendant's] situation." ' . . . Notably, 'the fact a participant [or planner of] an armed robbery could anticipate lethal force might be used' is not sufficient to establish reckless indifference to human life." (*Ibid.*)

Whether a defendant acted with reckless indifference to human life depends upon the totality of the circumstances. (*In re Scoggins, supra,* 9 Cal.5th at p. 677.) "Relevant factors include: Did the defendant use or know that a gun would be used during the felony? How many weapons were ultimately used? Was the defendant physically present at the crime? Did he or she have the opportunity to restrain the crime or aid the victim? What was the duration of the interaction between the perpetrators of the felony and the victims? What was the defendant's knowledge of his or her confederate's propensity for violence or likelihood of using lethal force? What efforts did the defendant make to minimize the risks of violence during the felony? [Citation.] ' "[N]o one of these considerations is necessary, nor is any one of them necessarily sufficient." ' " (*Ibid.;* see also *People v. Strong, supra,* 13 Cal.5th at p. 706.)

In *Emanuel, supra*, 17 Cal.5th, at p. 875, murder victim Sonenberg had arranged to sell a pound of marijuana to defendant Emanuel and his codefendant Whitley. (*Ibid*.) Sonenberg arranged to meet Emanuel near a

17

park, in the middle of the afternoon, in order to complete the deal. (*Ibid.*) Based on the available evidence, it appears that Sonenberg was inside of his truck, with the ignition on, when Whitley and Emanuel approached the truck on a residential street. Whitley pulled a handgun on Sonenberg, hit him with the gun, pointed it at Sonenberg's leg, and demanded the marijuana. Sonenberg refused to give up the marijuana, so Emanuel said " 'let's go' " and started to leave. (*Id.* at p. 891.) Sonenberg tried to push Whitley's handgun away from him. Whitley's handgun fired once, striking Sonenberg in the neck. (*Id.* at pp. 895-896.) Sonenberg's truck lurched backward with enough force to throw him out of the passenger door. (*Id.* at p. 877.) First responders arrived at the scene. Sonenberg was found lying against a curb; however, he "died at the scene from a 'close-range' gunshot wound to the right side of his neck that perforated his carotid artery." (*Ibid.*)

In 2015, a jury found Emanuel guilty of first degree felony murder. (*Emanuel, supra*, 17 Cal.5th, at p. 879.) At that time, a defendant could be found liable for murder if he "committed or attempted to commit an inherently dangerous felony, such as robbery, and an accomplice killed someone during the commission of the felony." (*Id.* at p. 876.) In 2018, following the passage of Senate Bill No. 1437, Emanuel filed a petition for resentencing. (*Id.* at pp. 879-880.) The trial court issued an order to show cause, and after an evidentiary hearing in which the court reviewed the 2015 trial transcripts, the court denied the petition. The court determined "that Emanuel was a major participant in the robbery who acted with reckless indifference to human life." (*Id.* at p. 881.) The Court of Appeal affirmed. (*Ibid.*) After analyzing the "reckless indifference" factors, the California Supreme Court disagreed with the ruling of the trial court and remanded for resentencing. (*Ibid.*)

### 3. *Analysis of Grandison's Contention*

Here, as in *Clark*, "we need not decide whether, under the circumstances of this case, defendant was a major participant . . . because, as discussed below, we conclude that the evidence was insufficient to support that he exhibited reckless indifference to human life." (*Clark, supra,* 63 Cal.4th at page 614.)

The first factor in the reckless indifference to human life analysis involves the defendant's use of or awareness of the presence of weapons. (*Clark, supra,* 63 Cal.4th at p. 522; *Emanuel, supra,* 17 Cal.5th at p. 885.) Grandison concedes he "likely knew Bush was armed," and the record supports that concession, as Grandison had used the gun in the second robbery, and returned it to Bush afterwards. However, the California Supreme court has cautioned: "The mere fact of a defendant's awareness that a gun will be used in the felony is not sufficient to establish reckless indifference to human life." (*Clark, supra,* at p. 618; *Banks, supra,* 61 Cal.4th at p. 809.)

" 'Awareness of no more than the foreseeable risk of death inherent in any [violent felony] is insufficient' to establish reckless indifference to human life; 'only knowingly creating a "grave risk of death" ' satisfies the statutory requirement." (*Scoggins*, at p. 677, quoting *Banks, supra,* 61 Cal.4th at p. 808.) Grandison did not use the gun in the commission of the count 1 felony murder. We conclude this factor is not sufficient to show a finding of recklessness because at the most it points to Grandison's awareness that a gun would be used. It does not show Grandison knowingly created a "grave risk of death." (*Banks, supra,* 61 Cal.4th at p. 808.)

The second factor relates to the defendant's physical presence at the scene and opportunities to restrain the crime or aid the victim. "Proximity to

19

the murder and the events leading up to it may be particularly significant where . . . the murder is a culmination or a foreseeable result of several intermediate steps, or where the [co-]participant who personally commits the murder exhibits behavior tending to suggest a willingness to use lethal force. In such cases, 'the defendant's presence allows him to observe his cohorts so that it is fair to conclude that he shared in their actions and mental state . . . . [Moreover,] the defendant's presence gives him an opportunity to act as a restraining influence on murderous cohorts. If the defendant fails to act as a restraining influence, then the defendant is arguably more at fault for the resulting murders.' " (*Clark, supra*, 63 Cal.4th at p. 619.)

In committing the count 1 felony robbery, Bush entered the Riverside convenience store alone, and therefore Grandison had no opportunity to restrain him, or to aid the victim. The evidence does not prove beyond a reasonable doubt that Grandison was aware, when they left the third convenience store, that Bush had killed the victim. This factor weighs against a finding of reckless indifference. Here, as in *Emanuel, supra,* 17 Cal.5th at page 894, Grandison "had no meaningful opportunity to aid [the victim] before the shooting." (*Ibid.*) Further, "On the record here, we conclude the circumstances of [Grandison's] flight make it difficult to infer his frame of mind concerning [the victim's] death." (*Ibid.*) As stated in *Emanuel,* "However contempt[i]ble we may find a defendant's conduct following a killing, the governing standard is not satisfied by evidence that the defendant was generally indifferent to the fact that someone *has been* killed; it requires evidence that, at the time of the shooting, the defendant acted with indifference toward the grave risk that someone *could be* killed. Though the former may be evidence of the latter, it is insufficient, standing alone, to support murder liability." (*Id.* at p. 895.)

20

The third factor relates to the duration of the crime. A lengthy interaction between perpetrators and victims of a felony may increase the risk of resistance, conflict, and violence. "Courts have looked to whether a murder came at the end of a prolonged period of restraint of the victims by defendant. . . . Where a victim is held at gunpoint, kidnapped, or otherwise restrained in the presence of perpetrators for prolonged periods, 'there is a greater window of opportunity for violence' [citation], possibly culminating in murder." (*Clark, supra,* 63 Cal.4th at p. 620.) The People concede, and we agree, "the fatal robbery was short in duration." This factor thus does not support a finding of reckless indifference.

The fourth factor relates to the defendant's knowledge of his cohort's likelihood of killing. While it is true a defendant's willingness to engage in an armed robbery with individuals known to him to use lethal force may give rise to the inference that the defendant disregarded a "grave risk of death" (*Tison v. Arizona* (1987) 481 U.S. 137, 157), no evidence was presented at trial that Bush was known to have a propensity for violence, let alone evidence indicating that Grandison was aware of such a propensity. (Accord, *Clark, supra,* 63 Cal.4th at p. 621.) Although both Grandison and Bush had used the gun in prior robberies, and Grandison's use of it had resulted in a bullet being ejected, neither one had shot any of the victims before Bush used lethal force against the clerk in the third robbery.

The fifth factor relates to "[e]fforts at the planning stage to minimize the potential for violence." (*Emanuel, supra,* 17 Cal.5th at pp. 886-887.) "[T]he existence of efforts to minimize violence does not necessarily foreclose a finding of reckless indifference to human life" (*Scoggins, supra,* 9 Cal.5th at p. 682), however, given the "two-part nature of the mens rea" requirement. (*Clark, supra,* 63 Cal.4th at p. 622.) Where an "objective evaluation of the

21

circumstances" of the crime suggests the risk of violence is grave, the defendant's apparent efforts to minimize that risk may be unavailing. (*Scoggins*, at p. 683, citing *Clark*, at pp. 622-623.) Conversely, the absence of such efforts does not necessarily evince a subjective disregard for risk where the objective circumstances of the planned crime suggest the risk of violence posed is no more than that inherent in any violent felony. (See *Scoggins*, at p. 679.)

Grandison contends his "volitional surrender of the instrument of violence occurred approximately one hour before Bush's fatal assault on [W.T.]—a temporal gap that, combined with [Grandison's] return to the vehicle for the Riverside incident, demonstrates maximum feasible withdrawal short of physical abandonment of his confederates [*sic*]."

The People counter that the defendants "deliberately chose to rob gas station stores in the middle of the night with little to no activity where they could threaten store clerks at gunpoint when customers were less likely to enter or assist the victims." But this argument fails to address the efforts defendants might have taken to minimize violence. Moreover, the People's theory does not foreclose the possibility defendants planned to carry out the robberies in the middle of the night in order to reduce violence to the clerks, who would likely hand over the money they demanded as only a few customers, if any, would be around to defend or protect them. As the *Emanuel* court pointed out, "We have never required direct evidence that a felony was planned a certain way for the express purpose of minimizing the risk of violence; circumstantial evidence regarding the plan itself may suffice." (*Emanuel, supra,* 17 Cal.5th at p. 887.) In light of the reasonable opposing arguments raised, we conclude this factor is neutral and does not show reckless indifference to human life.

In sum, the only factor partly pointing to reckless indifference to human life is the fact that Grandison and Bush used the same gun in different robberies in the series, showing Grandison's awareness of the likely use of lethal force. But the California Supreme Court has "made clear that participation in a ' "garden-variety armed robbery," ' i.e., one in which the only factor supporting a reckless indifference finding is that a participant was armed with a gun, is insufficient without more to establish reckless indifference." (*Emanuel, supra,* 17 Cal.5th at p. 884.) Therefore, we must reverse Grandison's first degree murder conviction for insufficient evidence.

## II. *Abstract of Judgment Corrections*

The People concede and we agree the abstracts of judgment erroneously state that the convictions in counts 2, 4, and 6 are for first degree robbery. Bush and Grandison were charged with second degree robbery, and the juries were instructed only on that theory. The verdict forms do not specify the degree of the robberies. But under California law, upon the failure of the jury or the court to determine the degree of the crime of which the defendant is guilty, it shall be deemed to be of the lesser degree. (§ 1157.) Therefore, we conclude that the robberies in counts 2, 4, and 6 are in the second degree.

We also agree the jury convicted Bush and Grandison of being a felon in possession of a firearm and not a "convicted felon and narcoti[c]" as stated in the abstracts of judgment; therefore, the abstracts of judgment should be corrected accordingly.

As to Grandison, the People properly concede that based on the court's comments at sentencing, it intended to stay the sentences on counts 2, 3, and 7, as reflected in the minute orders and abstracts of judgment. Nonetheless, the court orally stated at sentencing that the sentences on these counts should run concurrently. But it is impermissible to impose a concurrent term

23

on a count and simultaneously stay that same count under section 654.  (See *People v. Jones* (2012) 54 Cal.4th 350, 353 [" 'It has long been established that the imposition of concurrent sentences is precluded by section 654 . . . .' [Citation.]  Instead, the accepted 'procedure is to sentence defendant for each count and stay execution of sentence on certain of the convictions to which section 654 is applicable' "].)  Grandison's abstract of judgment correctly reflects the section 654 stay, notwithstanding the court's error in its oral pronouncement.

As to Bush, the abstract of judgment shows the court imposed a "consecutive full term" of three years for count 6.  However, the court orally stated, "Under count 6, the court is going to use one-third the midterm for that charge of one year, and that will run consecutive to the determinate terms under counts 4 and 6 [*sic*]."  Given this discrepancy, the oral pronouncement of judgment controls.  (*People v. Myles* (2012) 53 Cal.4th 1181, 1222, fn. 14.)  Bush's abstract of judgment should be corrected to reflect that the court imposed a one-year sentence on count 6; therefore, his total determinate sentence should be 16 years eight months.

## DISPOSITION

The judgment as to John Lamont Bush is affirmed.  As to Roderick Lamar Grandison, his count 1 conviction is reversed, but the judgment is otherwise affirmed.  The matter is remanded for the court to amend both defendants' abstracts of judgment consistent with this opinion, prepare certified copies of them and forward them to the Department of Corrections and Rehabilitation.

O'ROURKE, Acting P. J.

WE CONCUR:


DO, J.


KELETY, J.

25